Please have a seat, folks. Good morning. May the clerk call the first case, or second case. 325-0071, Lori Heiden, Independent Administrator of the Estate of Massachusetts, Appellant by Devlin Scope v. Village of Westmont, Deputy by Justin Pryor. Good morning. Good morning. You may proceed. Good morning. Thank you. For the record, Devlin Scope, on behalf of the Plaintiff Appellant, Lori Heiden is the Independent Administrator of the Estate of Matthew Heiden, deceased. Your Honors, on February 23rd, 2023, the Village of Westmont intended to injure one of its employees. We know this because it sent three employees into an inherently dangerous underground water vault, and it never turned off the water pressure. Now, I say inherently dangerous because underground water vaults present multiple hazards simultaneously. They are deep underground. They are dark. And when I say, let's just slow down for a second. Deep, I mean underground, deep as in you can have hazards both via ingress and egress. So they're incredibly dangerous. They're dark. Imagine not being able to see three inches in front of you, in front of your face. That's how dark that these, in certain sections of a water vault can become. But they're also incredibly dangerous because they are confined spaces. Imagine not being able to go more than maybe half a foot in one direction or another in certain parts of the underground vault. And most importantly, they are, they have high exposure to water. And I don't mean just standing water. I'm talking about water that's under intense pressure. Now, when you take that combination of those circumstances, you have what I would say, respectfully, is an incredibly inherently dangerous situation. And the thing about it is I can say with the straightest face and with the greatest confidence that the village of Westmont did intend to injure somebody, one of its employees specifically. Now, it's never been the plaintiff's position that her son specifically was going to be targeted. It's her position that one of the village's employees, including her son, were a target. Therefore, she could, with a straight face, before the district, before the trial judge in DuPage County and before this appellate panel today, tell you without a shadow of a doubt that she is absolutely convinced, as am I, that the village of Westmont intended to injure her son. Now, to be clear, I don't throw accusations like that out half-baked. Lori Hyden has never accused the village of Westmont of intending to kill her son. We all know that the intentional killing of somebody is murder. She's not saying that. What she is saying is that when an employer, like the village of Westmont, that was on prior notice, per Illinois Department of Labor OSHA's citation that was issued back on July 28th of 2021, that specifically warned Westmont about the need to conduct a hazard assessment. And I want to focus today's argument about the hazard assessment itself. On July 28th, 2021, Illinois OSHA issued multiple citations to the village of Westmont. But the one that really matters the most is the citation for conducting no hazard assessment. Because if you understand the basis and the rationale for hazard assessment, you can understand why we can reasonably infer intent or at least be able to present evidence of intent once we're able to do some discovery. And then we can revisit this issue in a motion for summary judgment. Counsel, were you able to do oral discovery or just written discovery? Your Honor, I was not a trial counsel, but below, based on my review of the discovery in the file, was that some limited interrogatories were allowed, but no depositions and not comprehensive requests were produced. No depositions of any of the occurrence witnesses, nobody in supervisory authority at Westmont, and certainly none of the OSHA investigators that also would have interviewed some of these witnesses. So the idea of no, we did not intend to injure him or somebody else, that's a fact issue. That is inherently factual. So assuming you're successful here today, what should your instruction look like? The jury instruction is going to be a standard, it's going to be a standard wrongful death instruction. Was there a duty? Did they violate that duty? Doesn't it have to be intentional? Doesn't it have to say that they intended to injure your client? I think what happens, Your Honor, is respectfully, no. I think what happens is this. The intended issue is that you have a standard that you're applying to a motion to dismiss that's different than the standard you're asking the jury to find. All I'm saying is this, is that the standard for intent is to get out of the workers' compensation exclusivity bar. That's the only reason why we talk about intent. To what extent that's only what you do, but the jury is going to have to decide what actually happened so a family can find out what a jury believes actually happened to their son.  I think it's going to still be they intended to injure Matthew Hyde. That would be the instruction. Thank you. So, Your Honor, and the hazard assessment was so important because the hazard assessment dictates multiple things. It dictates, what is the actual work that's going to be performed? What are the necessary tools to perform that job safely? They never did that hazard assessment. If they had done the hazard assessment, they would have known specifically what personal protective equipment Matthew should have been equipped with, including a tether so he could be drawn out immediately if there was a problem, and or a respirator. And that's a very important part that everybody seems to have lost before the trial court. You have to have all of that together. It's not just one piece or the other piece, it's all of it collectively because it has to be a comprehensive assessment. So, the work plan, making sure that you have a confined space permit. They continually went into this vault without a confined space permit and by its very nature would dictate, what are the dimensions of the space that you're working at that are specific to that work site? It's not a one size fits all kind of situation. And most important, a lockout tagout provision. That valve was under intense pressure. Just imagine thousands upon thousands of pounds of pressure. There is no excuse, absolutely no excuse for not turning it off. It should have been de-energized. No human being should have been put in that location when you know that thousands upon thousands of gallons of water could just suddenly burst at any given moment causing you, a 20-year-old kid with no training specifically on this particular event, to deal with it. Counselor, is there any evidence in the record as to why they only did it they de-energized on one side but not on the other? Isn't there some evidence that they say the manufacturer said only one side needed to be de-energized? I've heard that. I have also heard that we used the wrong regulation. We used this, we used that. Everybody's pointing the finger at each other. From my perspective, only hearsay until people are actually under oath answering these questions and coming up with these explanations. It's hard to tell if you haven't got to the discovery stage yet. If you haven't got to the discovery stage yet, it's hard to tell. Exactly right. These are all questions I am burning to ask somebody. These are all questions I would like to show people documents and say, how can you explain this when you have to account for this? And particularly, this is another little detail that gets glossed over. Matthew was part of a three-person team. John Bushman, Frank Houlis, and Matthew Height. I can promise you that Matthew was the youngest and most inexperienced member of that group. Which is always more likely than not going to be the situation when you are dispensing people into inherently dangerous places. Older people, yours truly included, haven't just celebrated my 54th birthday, realized that my days, I have fewer days ahead of me than behind me. But 20-year-olds are not like that. They think that they're going to live forever. Which is why it's even more incumbent on public employers, like the Village of Westmont, to properly train and properly prepare their employees, especially when it's very foreseeable that a 20-year-old kid, hadn't even turned 21 yet, would likely need to know. Just like any other employee would need to know. That's why, based on our allegations, we believe, on a 2615 or a 2619, that Ms. Hyden has stated all she needs to state. Now, I can assure you and everybody else the obvious. If this court were to reverse, this does not mean that the Hyden Estate should expect a slam dunk. It does not mean, all it means is that they have a chance to prove their case. That is it. They get the chance to have the discovery. I can assure you that the Village of Westmont will gladly file a motion for summary judgment and throw just about everything in my face about why this is not their fault. That's their right to do so. I'm not saying that they don't have that right. But Lori Hyden has a right to present evidence. Because she is certainly not some flat earther complaining that something, you know, she's not raising a frivolous point. Counsel, similar question to what I had before. At that summary judgment hearing, the standard's going to be the same?  Short answer. What I would say, obviously, all the standard summary judgment issues, viewing the evidence in light most favorable to the plaintiff or the non-moving parties. Are you saying this is a negligence case then? I'm not saying this is a negligence case. I still stand by the position. So we have to be, an attention to injure is what the judge is going to have to find that you've shown in summary judgment. Yes, yes. I still believe that that is the case. It will have to be intent to injure Matthew or some other employee. I'm not saying it had to be specifically Matthew. It was Matthew on that day. Matthew drew the short stick on February 23rd. It could have just as easily been some other employee. More likely than not going to be a younger, non-trained employee that was not provided with PPE, a confined space permit, or a work plan. And had not been adequately apprised of the inherently dangerous situation he was going into. Thank you. Your Honor. You have plenty of time left. Thank you for answering my question is what I'm saying. Justice, did you? No. Okay. So I've already talked about the absence of the hazard assessments. All of the other cases, and this is, I think, pretty obvious to everybody that's read these cases. There is not a lot of Illinois case law that has really done this outside of the asbestos active concealment kind of situation. I fully acknowledge that. There's no case law. Well, you know, let me comment on that. Did you read the Cordes case? Yes. It came from the three of us a few weeks ago. Okay. How is this case? I'm sorry. I'm sorry. I did not. I thought you said COPAS. I'm sorry, Your Honor. No. I thought you said Cordes versus Bob something.  Albright. My question was going to be how is this case different from that one, if it is? Your Honor, I have not had a chance to review it. All right. Fair enough. I have reviewed COPAS. I thought you said COPAS, Your Honor. I'm sorry. Go ahead. So all of those cases, COPAS in particular, Bercow in particular, they all applied the substantial certainty test, or in Collier they didn't allow the plaintiff to proceed because the plaintiff had accepted workers' compensation benefits. So we have a situation that's factually questionable because Ms. Hibas alleged intentional intent to injure her son. She is not, on behalf of the estate, accepted any type of workers' compensation benefits that would deprive her of the ability to sue on behalf of the estate for... I believe counsel is arguing that you didn't bring that up at the trial, Cordes.  I believe counsel in the brief argued that you didn't bring up the fact that workers' comp was not applied for on the trial level. Your Honor, I only raised that point to address the factual distinction in Collier. We did not raise it below. We only raised the intentional intelligence exception. We aren't trying to raise some new argument. We're just trying to address the Collier situation. That's it. And as long as Your Honor understands that and accepts that, I'll gladly move on because that has really nothing to do with our particular case in terms of it's not some additional basis to stop us from being able to proceed because of the workers' comp act. The lockout tag out in particular, that was one of the things that we wanted to address, was that it was so simple and so avoidable. That's the most tragic thing about this. You could have easily de-energized that water valve for the two or three hours it's going to be down there. At the expense of what? My water might go off once every 12 or 13 months when the city has to do some work on the main. I'm out three hours, but at least I get to take my shower later in the day, and I'm able to live. That's a small price most people are willing to pay. I'm sure that's the small price the most residents of Village of Westmont would be willing to pay to have Matthew Hyatt alive today. His mom, his father, who are here in court today, they should be given the opportunity to ask the questions that all of us have about these facts. We shouldn't be forced to accept what a governmental entity will say at face value and say, oh, trust us and believe us. Now, the best disinfectant is sunshine. Let us ask these questions. Let us present questions to these folks about why you really did this and why you didn't do that, and then people can really decide for themselves, was this an intent to injure him, to cut corners, to say no, because that's our theory. Counsel, you also accept the benefits of the no-fault system, correct? You've explained that. Generally, yes. But no-fault systems can be abused. There was an implicit attack that Lori Hyden was trying to abuse this by trying to hold the Village of Westmont accountable. I would say that there's a polar opposite, that employers can routinely abuse the workers' comp system by saying, hey, well, I didn't mean to kill him, so too bad, so sad, file a claim, because there are limitations to the workers' comp scheme. There are limitations I can't really go into in this particular case because it wasn't raised below, but Matthew Hyden was 20 years old and unmarried. So that's a freebie for the Village of Westmont. And there are plenty of other employees just like him under the same circumstances across the state who really will get nothing if they ever die on the job. That's the reality. If I can, Counselor. Yes, sir. I've read the asbestos cases, Daniel's in particular.  And in that case, there was an individualized intent. Correct. In your case, you're arguing that there was a generalized intent to injure a employee as opposed to the employee. I think what I'm arguing is this, that there's a specific intent to have this custom and practice, knowing full well that it's inevitable that someone is going to die or get injured, excuse me. Get injured. Get injured. And you're going to do it anyway. You intend to do it. And how do you differentiate that from substantially certain, that it's not favored by the court? The distinction between substantially certain is, you know, there's a risk. Probably there's a risk. But here, you want to do it. You know you're going to do it. You've already factored this situation, the inevitability, into your prosecuting business. And that's really the distinction. It's a fine distinction, I realize, but that is a distinction. Whereas, you know, and here's, and I want to fine tune that because you could have a situation where, yeah, there's a good chance that someone could get injured under substantial certainty. But when you're looking at these facts, and that's why these are very fact-intensive cases, sometimes an employer could say, well, yeah, there's a risk, but we did this, and we got this, and we got this, where they're doing some real true balancing of risks versus outcomes and rewards. And said, well, we did this, and we did this, and we did talk to somebody. So, yeah, I think we're okay. I think that's a situation where you have a substantial certainty situation. Whereas here, it's, oh, no. No hazard plan, no abatement, no PPE, no confined space permit. No confined permits since 2017. Since 2017. That is, and listen, and we all know they haven't done other work since 2017. In confined spaces and underwater, underground waterfalls. Thank you. Thank you. Justice Anderson, any questions?  Thank you. Thank you, Governor. Thank you. Mr. Byer. Good morning. My name is Justin Byer, and along with my partner Elizabeth Thompson, we represent the Defendant Village of Westmont. We thank you for your time and the opportunity to respond to plaintiff's arguments. Well, Mr. Hyden's death is certainly tragic. The trial court properly dismissed plaintiff's amended complaint under 2619 based on the exclusivity provision of the Illinois Workers' Compensation Act. Additionally, the village also moved on two other bases, neither of which were decided by the trial court, but both of which provide this court with a basis to affirm the decision of the trial court. Specifically, under the Illinois Tort Immunity Act, specifically Section 2103, the village is immune from liability. Second, based on plaintiff's amended complaint, the plaintiff failed to plead proximate cause as it relates to the village's conduct. I want to start with the Illinois Workers' Compensation Act. As Your Honors noted in your questioning of plaintiff, it is the exclusive remedy that is supplied to a worker who is injured on the job. It is a tradeoff that the legislature, employers, and employees have reached, that there is not going to be discovery of injuries. They are going to be compensated. There are four limited, narrow exceptions to the Illinois Workers' Compensation Act. Only one of which is applicable here today, and that is the question of whether this was a non-accidental injury. The Illinois Supreme Court in Mirbury v. Marshall Fields and Company defined accidental to mean, quote, anything that happens without design or an event which is unforeseen by the person to whom it happens, close quote. That has been interpreted to mean that a plaintiff, in order to avoid the exclusivity of the Illinois Workers' Compensation Act, must plead specific intent to injure. That is the law throughout Illinois that was recently confirmed by this court in Cordis v. Bob's Albright Electric, Inc. Illinois is a fact-pleading state. Mere conclusions of intent are insufficient. The plaintiff must plead specific facts to demonstrate that there was a specific intent to injure. Plaintiff took written discovery. There was no situation of limited interrogatories or limited written discovery, or sorry, limited document requests. The plaintiff received discovery from all the defendants in the case. The plaintiff did not object to that discovery. The plaintiff did not file a Rule 191B affidavit before the court indicating that it needed additional information to plead its complaint or prior to responding to the motions to dismiss. That is the procedural posture this court finds itself today. It was the plaintiff's burden, and the plaintiff simply did not provide facts to the trial court, and tellingly, in neither its opening brief nor its reply, did it provide facts to this court to demonstrate that specific intent. Counsel, I apologize because I think you just answered this question, but no discovery requests beyond those that you just spoke of? Correct, Your Honor. Now, the actual facts do not show specific intent, and really it's not a close question. As defined by Illinois courts, including this court, specific intent does not include aggravated or gross negligence, willful and wanton conduct, knowingly ordering an employee to perform an extremely dangerous job, willfully failing to furnish a safe place to work, willfully and unlawfully violating safety statutes, and even knowledge that an injury was substantially certain to occur. It's been repeatedly rejected. Heartline, Glasgow Associated Bank Corp, Kopass, Liminowski, Burkhart, Garland, even in the Supreme Court cases in Mirbury and Copier, sorry, too many cases rattling around in the head. Those courts explained what was necessary to meet that threshold, and it just wasn't here. Now, the village took specific lengths in its response to point this court to the actual allegations that the plaintiff made. Those are quoted on pages 19 through 22 of our response. And in one column we put quoted allegations, and in the second column we put how we deciphered those. The vast majority of those were either negligent acts or not admitting that these were negligent acts, but this is what the plaintiff pled, or were mere conclusions. So, Counselor, it sounds like you're telling us that there's nothing. If Westmont knew that they were sending a 20-year-old into an inherently incredibly dangerous situation, if they knew he was likely to be injured, not actionable. I think that that's substantial certainty, Your Honor. Okay. I think Justice Hedl asked the question before. Okay, so would substantial certainty get you passed, or get the plaintiffs passed, the exclusivity provisions of the Workers' Cop Act? It does not. Illinois law, including this court's decision last month in Cordes, my understanding, Your Honor, wrote a dissent to that case. So what if it was rigged with explosives, somebody else did it, and they sent a 20-year-old in there who had no training on how to disarm bombs. They sent a 20-year-old canary into the mine to pull the plugs. That wouldn't get past workers' cop exclusivity? I don't think so, Your Honor. I think, unfortunately, the way the legislature and the way the courts have written this law is that it requires specific intent to get past the complaint stage, just to get into discovery. And I know that counsel made a reference that Mr. I'm sorry. Go ahead. Complete your answer. Well, I was going to transition slightly, so if Your Honor would ask. Specific intent you're talking about, counsel made it clear that he wasn't talking about specific intent to injure a particular person, but just specific intent to injure. You agree with that? I do not. I think that really falls under the category of substantial certainty. The concept that someone is going to be injured, unknowing when, unknowing who, that is more akin to substantial certainty. And as a co-pass court noted 30 years ago, the things that I rattled off a moment ago do not constitute specific intent. And I think as we look at the line of cases that have been decided over the years, Hartline does a nice job of explaining that there needs to be allegations about who intended the person to be injured and why they intended the person to be injured. It is insufficient to say that there are dangerous conditions, and a dangerous condition is going to eventually lead to someone being injured. That is what the Burkhaw case encountered, where Domino's Pizza was sending delivery drivers out to deliver pizzas to areas that they were known to be crime riddled and sending them to pay folks. And the court there said that's simply not specific intent. And so I think we have a body of case law that has defined what specific intent is. I want to transition into the idea of what that requires. And there is case law that what needs to be pled is that the village ordered, commanded, or authorized to be worked to be performed in such a way that it was going to lead to the injury that takes place. And not substantially certain, but actually caused the injury. And so we've seen that in the Daniels case, where in that particular instance, the corporate officers of defendant ABC were aware that they were ordering someone to remediate asbestos. And they did so, and they knew that that person wasn't being told, and they deliberately put him in a situation where he was going to be removing asbestos. And the allegations in that case was that encountering asbestos was going to cause an immediate harm. Now, the specific intent there was to hide information from that individual. And I want to cover that to an extent, because in the record, the plaintiff pled that Mr. Hyden received training in November of 2021. And in the record, we see what that training included. And there is training on all of the items that plaintiff's counsel now argues the village was at fault on. Well, doesn't that suggest, perhaps, that the village knew as well and didn't do anything to correct whatever malfeasance, or whatever you want to call it, negligence or indifference to this young man's life? I mean, they knew. I mean, isn't the village charged with the same knowledge as the young man and did nothing? I mean, there wasn't a permit since 2017 for a confined space. That's a fair point, Your Honor. I was addressing more on the training aspect. But in terms of that training, one of the things that the plaintiff alleges is that the training that was prepared by then-defendant Irma was faulty and that it had incorrectly labeled the water vault as not being a permit-required confined space. No, but I mean, Irma also says in their motion to dismiss that you guys had all the knowledge you needed to and ignored it. That's what they say in the reply to the motion, in their reply in the motion to dismiss. They point the finger at you saying you guys were, I don't know, I guess just gross. I mean, Irma does point the finger at you. I recognize that, Your Honor. And there's affidavits that are attached. I don't remember affidavits being attached to Irma, but I could be. Well, there was documentation, including the training materials and a signing sheet for the training that you spoke of. Yes, and my point on that was that Mr. Hyden was present in that training, and that training did cover lockout-tagout. It covered confined space permits. It presented the race. So he's responsible for the permit now? So we are straying a bit from what was necessary in the trial court. And what was necessary in the trial court was for the plaintiff to plead specific intent. Without getting to that point, we don't get to a point where we start to talk about weighing that evidence or even getting into it. You know, there was never a point where the village was adverse to anyone in this case. It did not answer the complaint. It did not file third-party complaints. There were no third-party complaints filed against it. We were simply evaluating the plaintiff's allegations in this case and why they were insufficient here. I want to talk about why OSHA violations themselves are insufficient to establish specific intent. First, we know that the Merrick case, the Seventh Circuit decision, indicated that OSHA violations cannot be used to affect the statutory liability under workers' compensation laws. We cite to a host of different states that have evaluated what OSHA violations show and why in each of those particular states, New Jersey, Florida, Kentucky, Louisiana, Connecticut, Tennessee, why the violation itself was insufficient to demonstrate the intent necessary under those states' statutes. We also know that in the Northern District of Illinois, the Medina case, an employer was alleged to have known about a defective machine that had injured several additional people and how despite that knowledge and despite instructing the then-plaintiffs to work on that machine in the same manner, that that was not specific intent. And if we look at the actual prior citations, we can also see why specific intent is not evidenced by those OSHA violations. And that's because, as the plaintiff alleges, the village was cited for serious violations in 2021 and 2022. I don't want to make light of the fact that this occurred. That's not my intent. But a serious violation under Illinois OSHA Act 820 ILCS 219-85D is defined as creating a substantial probability of death or serious physical harm from conditional practices. And as the court knows, Illinois has rejected the substantial certainty test. So a substantially probable issue raised by OSHA does not evidence specific intent. I see my time is limited, so I do want to quickly move into why dismissal is appropriate under the Tort Immunity Act. Tort Immunity Act 2103 unfolds when law is directly related to public health, safety, or welfare. It absolves municipal corporations like the village from liability for injuries caused by failure to enforce any law. The law is defined under the Tort Immunity Act as including constitutional provisions, statutes, ordinances, regulations, and case law. So the IOSHA clearly falls under that. And immunities provided by the Tort Immunity Act are absolute unless expressly limited by the Illinois legislature, and that did not happen here. Finally, we argue that there was a failure to plead proximate causation. How was that, Counselor? I recognize this is a bit of a circuitous argument, Your Honor, but when we look at what the plaintiff alleged, there are two...  Sorry? A bit. Well, the plaintiff alleges that there was a failure in training. The plaintiff also alleges that the training was provided by IRMA and that the defect in the training was IRMA's. They plead that the training was provided. And so if there was a failure to conduct lockout-tagout or conduct a permit-required confined space or have PPE on hand, but IRMA defectively designed training materials that said that that fault was not a permit-required confined space, then the plaintiff itself has alleged that a party, that they claim the village relied on for the training material. That's in their allegations. You cannot impute that, then, to the village. And similarly, as Justice Bertani mentioned in questions to the plaintiff, the manual also said that the manner in which the lockout-tagout was conducted based on the manufacturer's manual was proper. And so the notion that the two arguments that they present are on training and lockout-tagout, both of which they also allege were the responsibilities of another party. Unless there's any other questions, I thank you for your time. I have no further.  Thank you. Thank you, Counsel. Mr. Scope? Thank you, Your Honor. Mr. Scope, before we get started, the question was posed, the why. You've argued in your brief the why. You've argued in your brief that greed was a motive, which to me is typically a motive of a village. It's not a profit entity. It's a government agency. What is the why? No, the why is greed, and this is why. Governmental entities are no different than private corporations. Everybody has bottom lines they have to address. Every year, every governmental entity has a fiscal year, they have to report to the taxpayers. Nobody wants to go back to the taxpayers and ask for more to cover certain expenses. We are all told to live within our means, and sometimes people do this to live within their means. That's the elaboration on the why. Now, the panel mentioned the phrase canary in a coal mine, and I want to talk about that for a second. Everybody knows the purpose of the canary except the canary, because the canary is an animal. It doesn't know any better. Its purpose is to go into the coal mine, and if it dies, we know it's dangerous, and we need to go out there. So the specific intent is to send something in to die. Now, in this situation, we're not accusing the village of Westmont of wanting to kill specifically Matthew Biley. Our point is a very simple one. The cost-benefit analysis was it was cheaper just to cut corners, not to energize the proper lockout tagout. What I heard today was, let's blame Matthew, okay? Well, for years, they hadn't gotten confined space permits since 2017. We're told that Matthew was trained. Well, yes and no. One of the parts of the training, yes, he attended the training, yes, he signed the sign-in sheet, but one of the things is trainings are only good as they are enforced, and one of the things that we learned in discovery is this, is that all the employees are trained, that you have to have a proper blackout tagout, but you're also trained that you have to follow the confined space plan. We didn't have one of those. So how is Matthew going to be expected to follow his training when they don't provide him with the necessary tools, including a confined space plan, a safety plan, and a permit? Because all of those together will tell him specifically, literally to the team, what to do here, what to do here, when we're in certain parts of the vault, and make sure you have the proper PPE, which they never gave him. So essentially, he was set up to fail, fail disastrously at his own expense, the cost of his own life. Now, VRCA was mentioned. I just heard, I thought I heard, someone suggest that, well, VRCA used a substantial certainty test. No. The reason why Domino's Pizza was not held liable for the death of the 20-year-old kid that was delivering a pizza was because the record was devoid of any facts that Domino's knew specifically that kids were going to be dispatched to a high-crime area where they're going to get shot in the head for $20 in a pizza. There was no evidence that Domino's specifically knew that. There was no evidence that they knew about that risk, and that Domino's didn't want to specifically send somebody in there. Here, Matthew was a proverbial canary. He went in, and while he told them, generally, you should look for this and be aware of that, they didn't give them the necessary tools to be able to follow that training. That's a classic setup to fail for the same reasons I said before. They wanted to cut costs so they didn't have to go back to the taxpayers of Westmont and say, hey, we need an extra couple million to do this, to do it safely. I would suggest that most parents that live in Westmont whose kids might work for the village one day would say, you know what, that's a small price to pay for Lori's son, or my son, or somebody else's daughter. And they deserve the right to know all of the facts. And one last thing. The Tort Immunity Act has no play here. They were not enforcing the Occupational Safety Health Act that day. They were violating it. Every case they cite was factually distinguishable, legally distinguishable, and I stand by that brief, and the assertions of the frivolousness of that argument. I have nothing else to add, to your honors, to my arguments. If there are any questions. Counsel, it's not so much a legal question. I mean, I read the briefs, but I'm trying to visualize this space that he was in. It's a water vault. Yes. I've never been inside of a water vault. If you told me to go into one, I would tell you, heck no, I'm not doing that. Right. Can you help me understand what this is? In the records. The problem is this. The record is not. Every water vault is different. They're very, very different. And that's one of the reasons why the confined space permitting was so important and the safety plan was important. Because it's not one size fits all. It's custom tailored for every water vault. So a water vault in Westmont could be different than a water vault in Rockford or in St. Louis, Missouri. I just don't know. I'm not going to speculate. Fair enough. Thank you. Counsel, the discovery issue. I'd ask you about it at the onset of your original argument. Counsel for the village says that you didn't ask for any discovery. Your Honor, well, I'm not going to argue with him about what was asked for. I can tell you this. Interrogatories were certainly exchanged or propounded. Some limited requests produced. No depositions. No examination was done at all. And I realize, you know, that's what the record says. I would suggest to you that given the implicit factual assertions and arguments that are made in this motion to dismiss, that they shouldn't be given more credence and credibility and assumptions of truth than the factual allegations made in the interrogatory. At least procedurally. If they want to do that, give us some discovery, and then go ahead and file your motion for summary judgment. Justice Percotti, any questions? Thank you, Justice. Thank you. Thank you. Counsel, thank you very much, both counsel, for your arguments in this case. We will take this under advisement and issue a ruling in due course. Thank you, folks.